[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON PETITION FOR TERMINATION OFPARENTAL RIGHTS
On or about January 4, 1993, the petitioner, the mother of Curt R., filed a petition in Probate Court to terminate the parental rights of respondent father, become Curt's sole guardian, and allow her present husband, Curt's stepfather, to adopt him. The original petition included CT Page 6881-P respondent father's consent to termination which was also executed and acknowledged on January 4, 1993. On July 1, 1993, father moved to transfer the case to Superior Court; the Probate Court granted that motion. Subsequent to the petition's transfer to Superior Court, father appeared, and the Court (Silbert, J.) allowed him to withdraw his consent on October 28, 1993. On January 11, 1994, mother amended her petition by adding the following grounds: (1) father abandoned his son in that the father failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of his son; (2) father has denied his son by reason of an act or acts of parental commission or omission, the care, guidance, or control necessary for his physical, educational, moral or emotional well-being; and (3) there is no ongoing parent/child relationship between father and his son and to allow further time for the establishment or reestablishment of the parent/child relationship would be detrimental to the best interests of his son.
The minor child, Curt R., was born on June 2, 1989, and turned five years old during the hearing on the termination petition. Trial commenced on May 31, 1994, and completed on June 3, 1994. All parties appeared and were represented by counsel.
II. BURDEN OF PROOF AND STATUTORY PROCEDURE
Our state courts have recognized that "it is both a fundamental right and the policy of this state to maintain the integrity of the family". In re Juvenile Appeal (83-CD),189 Conn. 276 (1983). ". . . [C]onsideration of the best interest of the child cannot vitiate the necessity of compliance with the specified statutory standards for termination." In re BarbaraJ., 215 Conn. 31 (1990). This compliance with statutory procedure is not inconsistent with concern for the best interest of the child. In re Juvenile Appeal (Anonymous), 177 Conn. 672
(1979). For a more recent discussion of the termination of parental rights and attendant authority, see In re Jessica M.,217 Conn. 459 (1991) and In re Valerie D., 223 Conn. 492 (1992).
In a proceeding for termination of parental rights, the petitioner must prove a ground alleged in the petition, as of the date of the filing or the last amendment, by clear and convincing evidence. In re Theresa S., 196 Conn. 18 (1985). [See also Connecticut General Statutes § 17a-112(b) and Practice CT Page 6881-R Book § 1049.] Only one ground need be established for the granting of the petition. In re Juvenile Appeal (84-BC),194 Conn. 252 (1985); In re Nicolina T., 9 Conn. App. 598 (1987).
Termination of parental rights proceeds in two stages: the adjudication and the disposition. The adjudicatory stage involves the issue of whether the evidence presented established the existence of one or more of the statutory grounds as of the date the petition was filed or last amended. In re JuvenileAppeal (84-AB), 192 Conn. 254, 264 (1984); In re Nicolina T., supra at 602; In re Luke G., 40 Conn. Sup. 316, 324 (1985). Establishment of one or more of the statutory grounds is a mandatory prerequisite to an inquiry regarding the ultimate best interests of the child. Section 17a-112(b) of the Connecticut General Statutes sets forth the statutory grounds for termination. Since that language is set out in the disjunctive, as previously stated, one ground only need be established for the granting of the petition.
III. FINDINGS
At trial the petitioner mother introduced testimony and exhibits through the following witnesses: Ashley Saunders, the child's therapist from the Child Guidance Clinic of Southeastern Connecticut; Dr. Robert D. Meier, a clinical psychologist; Mark, the child's stepfather; and the petitioner, the mother. The respondent father called the following witnesses: Lisa Brandes, father's counselor from the Alternate Incarceration Center (AIC), Peggy M., father's current girlfriend, and respondent father. Counsel for the child recalled the petitioner mother as a witness. All parties stipulated to the admission of three exhibits: the study for Probate Court, dated May 10, 1993; the updated study for Probate Court, dated June 17, 1993; and the updated study for Superior Court, dated January 27, 1994. All parties waived closing arguments and the Court ordered all briefs to be filed simultaneously by the close of business June 17, 1994.
Ms. Saunders testified she had approximately twelve meetings with Curt between January of 1994 and April 18, 1994. She stated that Curt exhibited a higher level of anxiety than he normally did when she discussed his father with him. She felt Curt had no positive memories of his father and any visitation with him would be traumatic "unless father changed his parenting style or approach to the child". Ms. Saunders never saw father with the child, but felt that from her experiences with Curt, CT Page 6881-S Curt is very attached to his mother and sees his stepfather as his psychological father, his "new daddy", and has continued negative feelings toward his biological father.
Dr. Meier conducted individual evaluations of mother, father and stepfather, and a partial parent/child relationship with mother, stepfather and Curt. Father did not show up for his parent/child interview due to his inability to get time off from a new job. Curt was more relaxed with Dr. Meier when he learned that he would not be seeing his father. Dr. Meier testified that Curt should not be forced to see his father without a great deal of preparation. Mother did make some negative comments about father in the child's presence, and while Dr. Meier did not believe mother had "brainwashed" Curt, he did feel that she caused his negative feelings toward his father to be exacerbated. He opined that the likelihood of reunification with father without intensive therapy would be very difficult. (Exhibit, Petitioner's 1.)
Mother and stepfather have been married since February, 1993, recently separated and currently are going through counseling. Stepfather has a good relationship with Curt and continues to spend time with him and pay for his day care despite being separated from mother. Mother currently resides with a friend, "J.R.", and her son. Stepfather would still like to adopt Curt.
Mother characterized her relationship with father as "up and down" and physically and verbally violent. Mother stated father hit her, broke her finger and dislocated her shoulder and was physically abusive to Curt. Mother left father in April of 1992, and subsequently in March of 1993, while father was incarcerated, had a "no contact" restraining order entered against him, which was periodically extended until April of 1994. Since she left, father saw Curt three times, all in the presence of mother, his last visit the day before he entered jail in January of 1993. At this visit, mother admitted that Curt hugged his father. Mother stated he called her but never asked about Curt and never sent cards or gifts and never paid her any child support. Mother met with father in January of 1993, prior to his incarceration, at which time she stated he voluntarily consented to terminate his parental rights.
Mother testified that Curt has nightmares about his father, and father has not pursued any visitation since his release from jail. Mother stated she never said anything mean CT Page 6881-T to Curt about his father and never asked father for money in exchange for his visitation. Mother admitted prior criminal involvement including passing bad checks, criminal impersonation, conspiracy, and family violence (with stepfather) which led to a breach of the peace.
Lisa Brandes testified that she was father's counselor at the AIC program from November of 1993 through May 30, 1994, when father successfully completed the program. During that time, father attended weekly AA meetings and all his urine and breathalyzer tests were negative. She stated that there is a strong likelihood he will stay clean as he is motivated to be reunited with his son. While in the AIC program, father attended the group anger management sessions, although Ms. Brandes stated there was never any referral for individual anger counseling.
Peggy M., father's girlfriend since September of 1992, was present in January, 1993, when father met with his son and mother. Curt was excited about seeing his father but became angry at the end of the visit when his father would not go home with his mother. Ms. M. stated that father never hit or hurt her and was truthful with her.
Father was incarcerated from January of 1993 until November of 1993 for conspiracy to commit forgery, larceny and criminal impersonation. These were the same criminal charges involving a check writing scheme to which mother also admitted involvement. Father claimed he never hit Curt except to spank his "precious butt" occasionally. Mother and father coined this phrase to describe their son's posterior. Father did not try and see Curt once he was out of jail; he was afraid the restraining order was still in effect and he would be rearrested. Prior to his incarceration, father said mother told him if he wanted to visit Curt, he would have to pay her $100 a visit. Father sent mother and Curt each a letter while incarcerated, stating he wanted to try and be a better father.
Father denied physically abusing mother. He stated he never chipped her tooth, and he did not dislocate her shoulder (it "popped out" constantly on its own). Mother dislocated her finger once, but that was when she caught her finger in a key ring father tossed at her. He claimed he never did anything to make her feel she was in bodily harm. He further claimed that she learned about restraining orders from her sisters who had CT Page 6881-U filed them in the past, and this is why she filed a no contact restraining order against him.
Father stated mother tricked him into executing the consent to termination of his parental rights in January of 1993. Mother told him Curt needed medical attention, and since he was going into jail, she could obtain it more easily if father signed the consent. She assured father that he could have his rights reinstated later. Upon learning of the alleged deception, father contacted the prison counselor who then put father in contact with court-appointed counsel.
Father did give Curt a Spiderman doll when he saw him in April of 1992.
Father admitted he had not paid child support but he is working now and would be willing to do so. Father does not believe he needs "mental health treatment" as he stated, "I'm not mentally ill". He would attend parenting classes and individual counseling with a therapist. Father accepts that Curt may be angry with him, but will do whatever is necessary to be with his son. He would be willing to gradually transition into visitation.
Court Exhibits A, B and C contain the three studies prepared by Pat Silva from the Department of Children and Families (DCF). In Ms. Silva's original study for the Probate Court, dated May 10, 1993, she recommended termination of father's parental rights, based in part on the fact that father had voluntarily consented to the termination of his rights. (Exhibit, Court A) Ms. Silva's updated study for the Probate Court, dated June 17, 1993, reversed her earlier study's recommendation. The updated study recommends a denial to the termination of father's parental rights. (Exhibit, Court B) It recommends that once father is released from prison, he should continue with appropriate treatment and begin supervised visitation with Curt. Ms. Silva's second updated study, dated January 27, 1994, confirms her first updated study: the petition to terminate father's parental rights should be denied. (Exhibit, Court B)
IV. TERMINATION RE: CURT R.
A. One Year Requirement
Section 45a-717(f) mandates any statutory ground CT Page 6881-V alleged for termination of parental rights "shall not be less than one year". Testimony elicited at trial shows that mother alleges she left father, taking Curt with her, in April of 1992. Petitioner filed her petition with this Court on July 6, 1993. Since one year passed from the time mother left father until the filing of the petition, the Court finds the one-year requirement has been met.
B. As to Respondent Father
As previously noted, petitioner mother alleged three statutory grounds for the termination of father's parental rights. These grounds are individually discussed below.
(1) Abandonment [Section 45a-717(f)(1), Connecticut General Statutes.]
The test for determining abandonment focuses on the conduct of the parent. In re Juvenile Appeal (Docket No. 9489),183 Conn. 11 (1981). "[W]here a parent fails to visit a child, has no personal interaction with the child, and shows no concern for the child's welfare, statutory abandonment has occurred."In re Magdalia M., 6 Conn. App. 194 (1986), cert. denied199 Conn. 809 (1986). In the case at bar the petitioner has not proven by clear and convincing evidence that father abandoned Curt. While it is true that father has failed to visit regularly with his son, lack of visitation has not been entirely his fault. Mother and father separated in April of 1992. He saw Curt three times during that time until the present time. All three times were prior to his incarceration in January of 1993. Father was in jail until late November of 1993, a total of eleven months. Clearly, he could not visit with his son during this time period; considering mother's feelings, she was not voluntarily going to bring Curt to visit father at the jail. When father was released from jail, a "no contact" restraining order was in effect — father stayed away and did not call or write for fear of being rearrested. The order expired in April, 1994, but that was only one month before the contested termination proceeding began.
Further, there was evidence in the record that father sent Curt a letter while in prison seeking to be a better father. Father brought Curt a gift on one of the three supervised visits he had with Curt in 1992.
This Court concludes, therefore, that the ground of CT Page 6881-W abandonment fails as a ground for termination here.
(2) Acts of Commission or Omission [Section45a-717(f)(2), Connecticut General Statutes.]
This ground is established when the child has been denied by reason of an act or acts of commission or omission by the mother/father the care, guidance or control necessary for his physical, educational, moral or emotional well-being. As set out in § 17a-112(b)(3) [companion to § 45a-717(f)(2), Connecticut General Statutes] of the Connecticut General Statutes, "Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights." A petition claiming a child has been denied necessary care, guidance or control by reason of parental acts of commission or omission, requires proof of specific conduct that has caused serious physical injury to the child." In re Kelly S., 29 Conn. App. 600 (1992). Most importantly, however, specific conduct can be proven through direct and/or circumstantial evidence. The law does not distinguish between the two as far as probative force is concerned. State v. Cimino, 194 Conn. 210 (1989). "The standard of `clear and convincing proof' used in this case denotes a degree of belief that lies between the belief that is required to find the truth or existence of the issuable fact in an ordinary civil action and the belief that is required to find guilt in a criminal prosecution." Dacey v. Connecticut BarAssn., 170 Conn. 520 (1976).
In the instant case, the petitioner has not proven by clear and convincing evidence that father committed acts or omitted acts which impaired the care, guidance or control necessary for Curt's physical, educational, moral or emotional well-being. At best, the evidence which exists is contradictory. There is no medical evidence of unexplained injuries. In fact, there is no medical evidence at all. Mother testified father punched Curt and split his lip; father testified Curt hurt his lip playing with his cousins at a family gathering. Father admitted he occasionally spanked Curt. Mother said father terrified Curt with his pet snakes; father said Curt was curious about the snakes and enjoyed playing with them. The testimony of the petitioner and the respondent was so contradictory, one begins to wonder if they were ever in the same place at the same time with this child. There is no proof CT Page 6881-X of specific conduct that father caused serious physical injury to the child. Therefore, the Court concludes that the ground of acts of commission or omission fails as a ground for termination here.
(3) No Ongoing Parent/Child Relationship [Section45a-717(f)(3), Connecticut General Statutes.]
This ground is established when there is no ongoing parent/child relationship with the mother/father which is defined as the relationship that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of the parent/child relationship would be detrimental to the best interests of the child.
No ongoing parent/child relationship contemplates a situation in which, regardless of fault, a child either has never known his or her parents, or that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced. In either case, the ultimate question is "whether the child has no present memories or feelings for the natural parent" In re: Juvenile Appeal,177 Conn. 648 (1979). The mere recognition of an individual as a parent will not defeat this ground. In re: Juvenile Appeal(84-6), 2 Conn. App. 705 (1984). The presence or absence of positive feelings on the part of the child is determinative.
Here, there is evidence that Curt not only recognized his father but was happy to see him and hugged him at their last meeting in January of 1993. While it is true that there now is evidence that Curt has anger for his father, there is also evidence that Curt was angry at his father when he would not return home with his mother in January of 1993. While it is true that Curt manifests fear of his father, there was testimony by Dr. Meier that mother's hostile feelings for father may exacerbate Curt's fear of his father as Dr. Meier heard mother make bad statements about father in Curt's presence. The Court questions why and how Curt's anger and fear developed since January of 1993 when he was openly and voluntarily hugging his father to now when Curt has not seen his father since that January meeting. CT Page 6881-Y
There is no clear and convincing evidence in the record that father's relationship with Curt has been completely displaced. Curt does have a close, bonded relationship with his stepfather, but in this Court's opinion, that should not preclude father from appropriately attempting to also have a relationship with his son. Father consistently testified he did not want custody of his son; he just wanted to be able to see him. The Court, therefore, concludes that the ground of no ongoing parent/child relationship also fails as a ground for termination here.
V. BEST INTERESTS
"Our statutes and case law make it crystal clear that the determination of the child's best interests comes into play only after [the] statutory grounds for termination of parental rights [relied on in the petition] have been established by clear and convincing evidence." In re Kelly S., 29 Conn. App. 600,617 (1992), citing In re Valerie D., 223 Conn. 492, 511
(1992). In the case at bar, the petitioner has not established, by clear and convincing evidence, any of the statutory grounds alleged in the TPR petition. On that basis, this Court need not consider and make findings on the criteria set out in § 17a-112(d) of the Connecticut General Statutes, as amended.
VI. CONCLUSION
The petition seeking mother's termination of respondent father's parental rights with respect to Curt is denied. The Court advises both mother and father to set aside their differences and hostile feelings for each other and objectively consider the best interest of their son. The Court orders respondent mother custody of Curt with reasonable rights of visitation for respondent father to commence under the following specified conditions:
(1) Visitation not to commence until:
 (a) Father voluntarily participates in an individual psychological examination by Dr. Meier and follows any recommendation of the evaluator regarding initiating visitation.
(b) Father enrolls in, attends and CT Page 6881-Z successfully completes parenting classes.
 (2) Subsequent to the completion of 1(a) and 1(b), visitation begins with supervised visitation, supervised by a mutual third party in a neutral setting, for limited periods of time to be transitioned to supervised visitation for longer periods of time to be transitioned to unsupervised visitation when the child's therapist deems such unsupervised visitation to be appropriate.
 (3) While father completes 1(a) and 1(b), the child should continue in therapy and be appropriately prepared for the gradual reintroduction of father into his life.
 (4) Father will continue with all after-care deemed appropriate by the Department of Adult Probation.
 (5) Father will participate in family therapy with Curt if and when that is deemed appropriate.
 (6) Father will begin contributing toward the support of Curt in accord with the current Guidelines for Support.
 (7) Mother will not speak inappropriately of father and father will not speak inappropriately of mother in Curt's presence.
 (8) Mother will not interfere with father's attempt to visit with Curt once father completes the Court's conditions as set out above.
 (9) This Court shall retain jurisdiction and DCF shall file an updated study with the Court 120 days from the date of judgment, updating the status of compliance in conditions numbered one through eight.
CT Page 6881-aa
Handy, J.